DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| WENDY BARNETT, | ) | CASE NO. 5:11-CV-399 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| v. | ) | |
| | ) | |
| AULTMAN HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

## I. The Motion Before the Court

On February 24, 2011 Plaintiff filed this action in the federal district court for the

Northern District of Ohio against Aultman Hospital alleging Defendant: 1) violated the Family

Medical Leave Act ("FMLA") by failing to provide Plaintiff notice pursuant to 29 CFR

§825.300; 2) discharged Plaintiff in retaliation for her attempt to exercise her rights under the

FMLA, and 3) terminated Plaintiff in violation of the public policy of Free Speech established in

the First Amendment to the United States Constitution. (ECF Doc. #1) Defendant answered on

April 25, 2011. (ECF Doc. #4.)

Defendant filed a Motion for Summary Judgment on June 1, 2012. (ECF Doc. #17.)

Plaintiff filed an Opposition to Defendant's Motion on July 10, 2012 (ECF Doc. #24), and

Defendant filed a Reply on August 6, 2012. (ECF Doc. #25.) For the reasons set forth below,

(5:11-CV-399)

Defendant's motion is GRANTED.   The Court will consider the public policy wrongful

discharge claim first, and then turn to Plaintiff's FMLA claims.

## II. Factual Background of the Action

Plaintiff Barnett is a registered nurse who began her employment in the psychiatric unit

at Defendant Aultman Hospital in March of 2002.(Barnett Aff. ECF #24-1.) Lisa Summer

became the Unit Director of the psychiatric unit some time thereafter. While Ms. Summer stated

that, from her point of view, she had no personality conflict with Ms. Barnett (Summer Depo.

ECF Doc. #18-1 at 173), Plaintiff considered Ms. Summer "abusive," (Barnett Depo. Doc #20-1

at 326) and ,because of a series of disciplinary actions, believed Ms. Summer was out to fire her.

(Barnett Depo.. ECF Doc. #20-1 at 328, 332.)

In January of 2011, while Plaintiff was at home on vacation, she received word

that Ms. Summer had been fired.  This was not true but, believing it to be true, Plaintiff sent an

e-mail through Facebook to at least 14 addressees, including 9 present or former employees of

Aultman Hospital. (Depo of Barnett, ECF Doc.#21-1 at 323, 324.) The email, sent on January 4,

2011, read:

> Wendy Barnett January 4 at 5:41 p.m.
>
> Lisa got officially ax (sic) today! I am singing DING DONG THE
> WITCH IS DEAD THE WICKED WITCH, DING DONG THE
> WICKED WITCH IS DEAD.
>
> How poetic this comes the same day Sexton died, I would
> much rather get f..cked up the ass with hot pepper than
> endured what that souless (sic) bitch put me through for
> 4 years...including turning me into the board...God does
> grind a fine mill when revenge is taken on by him...back when

2

(5:11-CV-399)

> I was off due to drug accusations and praying, and praying,
> never would I have imagined she lose (sic) her job, marriage,
> and family, friends all at the same time! Karma
> Now I should tell you how I really feel!
>
> Love and fuzzies,
> Wendy

(Barnett Depo.. ECF Doc. #17-2, at 128.)[1]

An employee in the unit, Ms. Mary Heran, provided Ms. Summer with a copy of Plaintiff's January 4 email.  (Summer Depo. ECF Doc. #18-1, at 178.)  Ms. Summer brought the email to the attention of Ms. Wendy Gotschall, Vice President of Cancer and Psychiatric Services for Aultman Hospital. After delivering the email, Ms. Summer was not involved in the investigation or subsequent employment action.

Ms. Gotschall's job responsibilities include investigation into misconduct by employees in the Psychiatric Services Department. (Gotschall Dec. ECF Doc. #17-3 at 154.) Ms. Gotschall contacted Ms. Marie Hooper, RN Unit Director of Memorial 6 South, and together they met with Plaintiff at approximately 10:15 on the morning of January 17. ( ECF Doc. # 192 at 228 .) The

---

[1]Ms. Summer instigated two previous disciplinary actions involving Plaintiff in 2008. On March 25, 2008 Plaintiff was given a verbal warning regarding excessive absenteeism. (Olivera Depo. ECF #19-1 at 292; Summer Depo. ECF Doc #18-1 at 173.) Less than a month later, on April 17, 2008, Plaintiff was given a three day suspension for "Inefficient/Careless Job Performance." (Summer Depo. ECF Doc. #18-1 at 176.) The suspension was prompted by a chart audit that revealed incomplete documentation of medication, e.g. medication was removed with no documentation, or medication was not given but removed. (*Id.*, at 176-177.) Ms. Summer referred Plaintiff to the Ohio Board of Nursing for investigation, and Plaintiff was required to submit to a drug test (which turned out negative) and placed on a corrective action plan.. (Olivera Depo. ECF Doc. #19-1 at 265; Summer Depo.. ECF Doc. #18-1 at 177.)

3

(5:11-CV-399)

events of the meeting were documented the same day by both Ms. Gotschall and Ms. Hooper. (*Id.*, ECF Doc. #19-2 at 286.) ( Note: Ms. Gotschall's memo was continued with updates and appears at as Exhibit 1 to her Declaration, at ECF Doc. #17-3 at 156-162.)

Ms. Gotschall confronted Plaintiff with the email and Plaintiff denied that she had sent it. (Barrett Depo. ECF Doc. #20-1 at 329.) Ms. Gotschall asked Plaintiff if she had typed the email; she denied it. (*Id.* at 330.) Instead, in an attempt to persuade Ms. Gotschall she hadn't written the email, Plaintiff began talking about people hacking into her account *(Id.* at 329-330.)  She also claimed that she had been unable to get into her Facebook account.  Ms. Gotschall and Ms. Hooper escorted Plaintiff to a computer, where she attempted to log onto her Facebook account, but was denied entry because she repeatedly used an incorrect password. (Barnett Depo. ECF Doc. #331; Gotschall Dec. Exhibit ECF Doc. # 17-3 at 157.) The attempts revealed that the Plaintiff's Facebook page contained the same name and picture as shown on the January 4 email. (ECF Doc. #19-2 at 287.)

During the January 17th meeting, Ms. Gotschall informed Plaintiff that Ms. Summer had not been fired or resigned. She suspended Plaintiff, with pay, pending an investigation. Plaintiff was informed that, if she had any information she wanted to present to back up her story, she was welcome to do so. Plaintiff was instructed not to return to the unit or discuss the matter with staff. Ms. Hooper escorted Plaintiff to her car. *(Id.* at 331, 289.)

That same day Plaintiff had a letter delivered to the hospital. ( Barnett Depo. ECF Doc #20-1, 337-338.) In the letter Plaintiff told Ms. Gotschall that she has "secured the information

4

(5:11-CV-399)

from [her] personal computer that [her] personal account" was subject to phishing[2] on January 12, 2011. Plaintiff advised Ms. Gotschall that she was going to turn "the information into the authorities to confirm and prosecute whoever tried to go into my account and in fact change words to reflect my personal inbox." (Barnett Depo. ECF Doc #17-2 at 129.)  She continued, stating:

> Furthermore, those words indeed were not mine, and is (sic)
> consider it very offensive as well as defaming to my character to even imply that I wrote them. The people who hacked in my personal account, <u>are the people who wrote it.</u>
> (Emphasis in original) *Id.*

Ms. Gotschall commenced her investigation by speaking with Mary Haren, the employee who provided a copy of the email to Ms. Summer. Ms. Haren confirmed that Ms. Barnett had admitted to her she sent the "celebratory" email. (Barnett Depo. ECF Doc.# 21-1 at 332; Gotschall Depo. ECF Doc. #21-1 at 638.)  On January 18, 2011 Selena Blackford, a Nurse's Aide from the Psychiatric Unit, came forward and offered to show Ms. Gotschall text messages she had received the prior week from Plaintiff. (Gotschall Depo. ECF #21-1 at 652; Olivera Depo. ECF #18-1 at 215.) Ultimately, Ms. Blackford was unable to retrieve the text messages on her phone, but she reported they said something along the lines of, "The witch is dead...Lisa got fired." (Gottschall Dec.Doc #17-3 at 158.) As Ms. Gotschall continued her investigation she was approached by doctors and nurses and told that Plaintiff had been calling and talking to staff, saying someone hacked into her computer. (Gotschall Depo. ECF #21-1 at 640.)

---

[2]"Phishing"involves attempting to acquire access to accounts or personal and financial information (e.g., passwords or credit card details) by sending out a legitimate looking email.

(5:11-CV-399)

Meanwhile, on January 18th Plaintiff contacted Elissa Snyder, the Aultman employee responsible for processing requests for leaves of absence. Plaintiff asked Ms. Snyder to send a copy of the Request for Family Medical Leave of Absence to her, and to her doctor. Ms. Snyder did so that day. (Barnett Depo Exhibit.ECF #17-2 at 134,136.) There is no evidence that Ms. Snyder told either Ms. Gotschall or Ms.Olivera of Plaintiff's request for leave.

Prior to or on January 19, Ms. Gotschall consulted with Ms. Sue Olvera, the Vice President of Human Resources at Aultman Hospital, and they concluded that Ms. Barnett would be terminated. Ms. Gotschall memorialized this decision in a memo sent Wednesday, January 19 at 7:16 p.m. (Gotschall Dec. Exhibit ECF Doc # 17-3 at 163-165.) Both Ms. Gotschall and Ms. Olivera provided declarations in support of Defendant's Motion for Summary Judgment, stating under penalty of perjury that they did not know Plaintiff had requested FMLA leave or FMLA paperwork prior to their decision to terminate Plaintiff. (Olivera Dec.ECF Doc.#17-4 at 167 ¶ 4; Gotschall Dec.ECF #17-3 at 155 ¶6.)

On January 20, Ms. Gotschall contacted Plaintiff to arrange for a meeting. Suspecting what was coming, Plaintiff said she would rather just be fired over the phone. (Barnett Depo. ECF Doc.#20-1 at 334.) Ms. Gottshall explained she needed to follow up in person; Plaintiff indicated she was not feeling well, but scheduled a meeting for that afternoon. She then called back and said that her doctor had advised her not to meet; during this conversation Plaintiff informed Ms. Gotschall that her doctor would be sending a medical leave of absence form for her.(Gotschall Dec. ECF Doc. #17-3 at 159; Barnett Depo ECF Doc #20-1 at 334.) This was the

6

(5:11-CV-399)

first time Ms. Gotschall heard of Plaintiff's intent to take a medical leave. (Gottschall Depo.ECF

Doc. #21-1 at 649, 650.)

    Ms. Gotschall told the Plaintiff she was sorry she wasn't feeling well, but the leave had

nothing to do with the investigation or proposed meeting. (Gotschall Depo.ECF Doc #17-3 at

159; Barnett Depo. ECF Doc #20-1, at 345.)

    Dr. Kothari, Plaintiff's doctor, faxed a work release to Aultman Hospital on January 20,

2011. (The work release is dated 1-18-11 but the fax transmission dating on the top shows that it

was sent on January 20, 2011 at 12:34 p.m.) (Barnett Depo. Exhibit ECF #17-2 at 140.)  Dr.

Kothari provided the Certification of Health Care Provider for Employee's Serious Health

Condition on January 21, 2011. (Barnett Depo. Exhibit ECF Doc. #17-2 at 136.)  It does not

appear that the signed Request for Family Medical Leave of Absence was returned until

February 4, 2011. (Barnett Depo. Exhibit ECF#17-2 at 132.)

    On January 26, 2011 Plaintiff called Ms. Gotschall and said she would like to come in,

with her attorney, and have the delayed meeting.  (Barnett Depo. ECF #21-1 at 335.)  Ms.

Gotschall informed Plaintiff that, under company policy, she could not be accompanied by an

attorney, but could bring a witness. A meeting was held the next day, January 27, 2011, with Ms.

Gotschall, Ms. Hooper, Plaintiff, and Plaintiff's son.

    At the meeting Plaintiff was advised that the result of the investigation was a

determination that she sent the email and lied repeatedly respecting her actions and that,

consequently, Aultman Hospital was discharging her for dishonesty. (Barnett Depo. ECF Doc#

(5:11-CV-399)

21-1 at 317.)  Plaintiff was specifically told that she was not being dismissed for the content of

the message, but because she had been dishonest. (Barnett Depo. Doc #21-1 at 316, 317.)

Ms. Gotschall said they were going to proceed with the termination but that, since

Plaintiff's offense did not involve patient safety, she would be given an opportunity to resign,

which would make it easier for her to find employment. *(Id.* at 317.) Ms. Gotschall also offered

to write her a neutral letter of reference, which she did. (A copy of the letter of reference is

attached to the Gotschall Declaration, Exhibit B to Defendant's Motion for Summary Judgment,

ECF Doc. #17-3 at 166.) Upon being told she could write anything she wanted on the Letter of

Resignation, Ms. Barnett stuck to her story, stating as her Reason(s) for Resignation:

> Hostile work conditions damaging and defaming my character, not related to my
> abilities and customer relations and that not only extends to pts (sic) but doctors,
> students an(sic) coworkers. A personal email that was alleged sent by me not via
> Aultman computers or work caused irreversible to my character." (Barnett Depo.
> ECF Doc. #21-1 at 344, ECF Doc. #17-2 at 141.)

At some point prior to her deposition, Plaintiff decided to come clean. At her deposition

Plaintiff admitted she lied about her authorship of the email (ECF Doc.# 20-1 at 316); she

admitted she typed the message (*Id.* at 330); she admitted she sent the message (*Id.*, at 324.)

Plaintiff also admitted she lied about someone hacking into her account to write and send the

message. (*Id.*, at 328-330.) She admitted that the letter delivered on January 17th contained

multiple lies (*Id.*, at 337, 338); she admitted she lied on her resignation form (*Id.*, at 344). Indeed,

Plaintiff admitted that up until the day she resigned she never told Ms. Gotschall the truth about

the email. (*Id.*, at 346,347). Thus, Plaintiff's pattern of lies and deceit is not in dispute.

8

(5:11-CV-399)

### III. The Aultman Hospital Handbook

At all times relevant to this action, the Aultman Hospital Handbook marked as ECF Doc. #20-2 was in effect. Under Disciplinary Process and Rules of Conduct the introductory paragraph of the handbook provides:

> Aultman requires its employees to comply with certain standards of behavior that are a basic part of good citizenship and that respect the rights of others. This is true on the job as well as in our private lives. Any conduct or activity that interferes with an employee's own work, the work of any other employee, Aultman's operations, or the maintenance of order on Aultman's premises is not permitted. (ECF Doc. #20-2 at 408.)

The Handbook provides a three-tiered list of "typical" behaviors resulting in employee discipline. Those listed in Group I are identified as, "Types of action that may result in *immediate discharge*"; Group II behaviors "may result in *suspension* after the first offense, and...may result in termination after subsequent offenses;" Group III lists actions "which may result in a *written warning*, followed by suspension and termination."*(Id.* at 409-410 (emphasis in original)).

The list of Group I offenses, justifying termination, includes, "Neglect, abuse or disrespect toward a patient, visitor or employee, " and "Dishonesty, deception or fraud." *Id.*

### IV. The Standard for Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 .  When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in

9

(5:11-CV-399)

the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962.)  However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986.)  General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes.  *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990.)  Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citing *Biechell v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984)); *but see Baer v. Chase*, 392 F.3d 609, 623-26 (3d Cir. 2004) (noting that a so-called "sham" affidavit need not be disregarded if there is "independent evidence in the record to bolster [the] otherwise questionable affidavit".)  Further, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252.)

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of

10

(5:11-CV-399)

either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250.  Put another way, this Court must

determine "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

*See also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003) ("[t]he

conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material

fact that preclude the grant of summary judgment".)

**V. Ohio's Public Policy Exception to At-Will Employment: The
Elements of the Wrongful Discharge Tort Predicated upon Public Policy**

In *Greeley v. Miami Valley Maintenance Contractors, Inc*. (1990) 49 Ohio St. 3d 228, the

Ohio Supreme Court created an exception to the common law employment-at-will doctrine by

recognizing an action in tort for wrongful discharge in violation of a "sufficiently clear" public

policy, such as a public policy based upon a state statute. Four years later, in *Painter v. Graley*

(1994) 70 Ohio St. 3d 377, the Ohio Supreme Court made it plain that a "clear public policy" may

be based in sources other than statute, including the Ohio and United States Constitutions,

administrative rules or common law. The Ohio Supreme Court recommended the analysis of

Villanova Law Professor H. Perritt, who set forth the elements of the tort a plaintiff would be

required to demonstrate as:

> 1. That clear public policy existed and was manifested in a state or federal constitution,
> statute administrative regulation, or in the common law (the *clarity* element);
> 2. That dismissing employees under circumstances like those involved
> in the plaintiff's dismissal would jeopardize the public policy (the
> *jeopardy* element.)
> 3. That plaintiff's dismissal was motivated by conduct related to the policy (the *causation*
> element.)
> 4. The employer lacked overriding legitimate business justification for

(5:11-CV-399)

the dismissal (the *overriding justification* element.)

*Painter*, supra, at 384 n. 8, quoting H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989) *58 U. Cin. L. Rev*. 397,398-399. The following year the Ohio Supreme Court formally adopted Peritt's four elements as the framework for Ohio's common-law claim for wrongful discharge in violation of public policy, and established that the first two elements (clarity and jeopardy) are questions of law. *Collins v. Rizkana*, 73 Ohio St. 3d 65 at 69-70 (1995).

Plaintiff's argument here founders on the very first element. There is no clear public policy forbidding private actors from restricting speech. The First Amendment's directive "[t]hat 'Congress shall make no law...abridging the freedom of speech, or of the press' is a restraint on government action, not that of private persons." *Columbia Broadcast Sys. v. Nat'l Comm.*, 412 U.S. 94, 114 (1973). This rule is so well established that the United States Supreme Court declared in *Hudgens v. N. L. R. B*, 424 U.S. 507, 513: "It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state" (citation omitted). While Plaintiff only pled and relied upon the First Amendment to the federal constitution, and did not mention the state constitution, it makes no difference: The Ohio Supreme Court has held that the free speech guarantees in the Ohio Constitution are exactly the same as those created by the First Amendment of the federal constitution so that,"[T]he First Amendment is the proper basis for interpretation of Section 11, Article I of the Ohio constitution." *Eastwood Mall, Inc. v. Slanco.* 68 Ohio St. 3d 221, 222 (1994). This case is directly on point: *Eastwood Mall* specifically held that Ohio's constitution Free Speech provision only

12

(5:11-CV-399)

applies to actions by the state, or a state actor. *Id*., at 223. Since there is nothing in the United

States Constitution or the Ohio Constitution that limits a private employer's ability to discipline

employees for expression, it is and should be also the case that a public policy wrongful discharge

claim predicated upon a constitutional guarantee of Free Speech cannot reach a private employer.

## VI. Under Ohio Law the First Amendment Cannot Be The Basis of a Public Policy Wrongful Discharge Claim Unless There is State Action

While the range of the First Amendment is a constitutional law question, the issue of

which constitutional protections may be the basis for a public policy wrongful discharge claim is

a question of state law. In 2002 Judge Carr of the Northern District of Ohio addressed the issue of

whether the public policy embedded in constitutional Free Speech guarantees could be the basis

for a public policy exception to the employment-at-will doctrine in an action against a private

employer under Ohio law. *Petrovski v. Federal Express Corp*., 210 F. Supp 2d 943 (N.D. Ohio

2002) In a thoughtful and lengthy opinion, he concluded that neither the First Amendment of the

federal constitution, nor the right to free speech under the Ohio constitution, may be the basis of a

public policy exception in a wrongful discharge claim in the absence of state action.

As Judge Carr noted, there is no decision by Ohio's highest court on the issue, and

therefore the federal court must "ascertain from all available data, including decisional law of the

state's lower courts, restatements of law, law review commentaries and decisions from other

jurisdictions on the 'majority rule' what the state's highest court would decide if faced with the

issue." *Petrovski, supra* at 947, quoting *Grantham & Mann, Inc. v. American Safety Products,

Inc.*, 831 F.2d 596, 608 (6th Cir. 1987).  On this issue, the decisional law of the lower Ohio

(5:11-CV-399)

appellate courts, the restatements of law, law review commentaries and decisions from other jurisdictions on the majority rule are all in agreement: Neither the First Amendment nor state constitutional guarantees of Free Speech can be the basis of a public policy exception in wrongful discharge claims in the absence of state action.

The Ohio Court of Appeals for the Tenth District considered the issue in 1999, under the guarantee of free speech in the Ohio Constitution. *Stephenson v. Yellow Freight Systems, Inc*. 1999 WL 969817 (Ohio App. 10 Dist. Oct. 26, 1999), discretionary appeal not allowed, 88 Ohio St. 3d 1432. The court made quick work of plaintiff's public policy argument: "[A]ppellant's contention that his wrongful discharge claim is....based upon the public policy embodied in Section 11, Article I of the Ohio Constitution (freedom of speech) is without merit as the prohibitions contained therein apply only to state action, not the actions of a private citizen of employer. (citation omitted)" Id. at *7. *Accord: Mitchell v. Mid-Ohio Emergency Services, LLC*, 2004 WL 2803419 (Ohio App. 10 Dist. Sept. 30, 2004) ¶ 23, n. 4 (holding the prohibitions contained in Free Speech guarantees in the federal and Ohio constitutions apply only to state actors).

As the court observed in *Petrovski*, the majority of courts addressing the issue conclude "'that state or federal constitutional free speech cannot, in the absence of state action, be the basis of a public policy exception in wrongful discharge claims.'" *Petrovski, supra,* at 948, quoting *Tiernan v. Charleston Area Med. Ctr., Inc.,* 203 W. Va. 135 (1998).[3]

_____

[3]In support of this position, the court in *Petrovski* cited the following cases: *Tiernan v. Charleston Area Med. Ctr, Inc., supra* (citing cases)(West Virginia); *Barr v. Kelso-Burnett Co.*, (continued...)

(5:11-CV-399)

The restatements and law review commentaries are in accord. Restatement (Third) of Employment Law §4.03 (T.D. No. 2 Rev., 2009); American Law Institute, ABA Continuing Legal Education, *Emerging Employment Issues Under State Law* (2005) at *1337-1339; Lisa B. Bingham, *Employee Free Speech in the Workplace: Using the First Amendment as Public Policy for Wrongful Discharge Actions*, 55 Ohio St. L.J. 341, 391 (1994)("The prevailing view is that the First Amendment cannot be the basis of a public policy exception in wrongful discharge claims in the absence of state action."), David C. Yamada, *Voices From the Cubicle; Protecting and Encouraging Private Employees Speech in the Post-Industrial Workplace*, 19 Berkeley J. Emp. & Lab L. 1, 22 (1998) (arguments for protection of private employee speech under state and federal constitutions have "had very little success in the courts").

There is one case which held the First Amendment applicable to private employers, *Novosel v. Nationwide Ins. Co.*, 721 F. 2d 894 (3d Cir. 1983.) In *Novosel* the Third Circuit predicted that the Pennsylvania Supreme Court would not require state action in a public policy wrongful discharge claim based upon the free speech. Subsequent state cases did not adopt the holding. *See: Radicke v. Fenton*, 2001 WL 229936 at *4 (E.D. Pa. March 8 2001); Restatement (Third) of Employment Law §4.03 (T.D. No. 2 Rev., 2009.) Recognizing this, in 1992 the Third Circuit acknowledged that, because of the state courts' "continuing insistence upon the state

---

[3](...continued)

478 N.E. 2d 1354, 1357 (1985) (Ill. Supreme Ct.);*Korb v. Raytheon Corp*., 410 Mass. 581, 584 (1991)(Mass.Supreme Ct.);Prysak v. R.L. Polk Co., 483 N. W. 2d 629,634 (1992) (Mich. App.); *Johnson v. Mayo Yarns, Inc.*, 484 S. E. 2d 840, 843 (1997) (N. C. App.); *Drake v. Cheyenne Newspapers, Inc*., 891 P.2d 80, 82 (Wyo. 1995). Additional cases include:*Miller v. Fairchild Indus.,* 629 A. 2d 1293 (Md. Ct Spec. App1993), *cert. denied,* 634 A. 2d 46 (Md. 1993) and *Edmondson v. Shearer Lumber Products*, 139 Idaho 172 (2003).

15

(5:11-CV-399)

action requirement," their revised prediction was that the Pennsylvania Supreme Court would require state action in a public policy wrongful discharge claim based on constitutional protections of speech. *Borse v. Piece Goods Shop, Inc*., 963 F. 2d 611, 619 (3d Cir. 1992).

Plaintiff in this case relies upon two cases: *Chapman v. Adia Servs*., Inc., 688 N.E.2d 604 (1st Dist. Ohio Oct. 17, 1997) and *Plona* v. *United Parcel Service*, Case No. 1:06-CV-01144 (Feb. 13 2007). *Chapman* held that an employee could not be discharged for seeing an attorney; *Plona* that an employer could not take disciplinary action based upon an employee's off-premises possession of a gun. Neither of these cases had anything to do with the First Amendment. They are irrelevant.

The Constitution's judicially enforceable guarantees of individual rights shield individuals from government action. Courts must proceed cautiously when transforming restrictions on the state to restrictions on private actors.  The protections of speech afforded by the First Amendment against government censorship are zealously guarded because they are fundamental to democracy: the state may not suppress speech of which it disapproves because that way lies tyranny. Speech restrictions on private actors do not create the same risk. Moreover, the restrictions appropriately placed upon the state are not appropriately placed on private actors: The state may not be able to forbid Cohen from wearing his "Fuck the Draft" jacket, but an employer should be able to require him to take it off. *Cohen v. California*. 403 U.S. 15 (1971).

Based upon the decisional law of the state's lower courts, restatements of law, law review commentaries and decisions from other jurisdictions on the majority rule, this Court concludes that Ohio's highest court, if faced with the issue, would hold that, absent state action, a wrongful

16

(5:11-CV-399)

discharge tort claim cannot be based upon the public policy expressed in the First Amendment to the federal constitution.

## VII. The Applicable Provisions of the FMLA and Structure of FMLA Analysis in the Sixth Circuit

The FMLA affords an eligible employee up to twelve weeks of leave within a twelve month period when the employee suffers from "a serious health condition that makes the employee unable to perform the functions of [his] position." 29 U.S. C. §2612 (a)(1) (D). Under the FMLA it is "unlawful for any employer to interfere with, restrain or deny the exercise of or the attempt to exercise [the] right to such leave." 29 U.S.C.§ 2615 (a)(1). Actions brought for violations of §2615 (a) (1) are commonly referred to as "interference" or "entitlement" claims. Under 29 U.S.C. § 2615 (a) (2) it is "unlawful for any employer to discharge or in any manner discriminate against any individual" for exercise of their rights under FMLA. Actions brought for violations of §2615 (a) (2) are referred to as "retaliation" claims. Plaintiff has alleged both interference and retaliation in this action.

In January of this year,  the Sixth Circuit ruled that both interference and retaliation claims should be analyzed using the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Donald v. Sybra*, 667 F. 3d 757,762 (6th Cir. 2012).  Thus, the Plaintiff must establish a *prima facie* case of statutory violation by a preponderance of the evidence. The burden then shifts to the employer to present a legitimate, non-discriminatory reason for the termination.  Assuming the employer makes this demonstration, Plaintiff can avoid summary judgment only if she can show that the stated reasons are a pretext for interference or discrimination. *Id.,* at 761. The Court will consider

17

(5:11-CV-399)

the *prima facie* cases separately, and then discuss, as to both causes of action, the issues of employer

explanation and pretext.

**A**. Plaintiff Failed to Make a Prima Facie Showing of Interference
With Her FMLA Rights Under §2605 (a) (1)

To establish an interference claim in the Sixth Circuit, *Edgar,*  Plaintiff must show:

(1)she was an eligible employee, (2) the defendant was an employer as defined under FMLA, (3) she was entitled to leave under FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled.

*Edgar v. Jac Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

Plaintiff's only claimed interference is that Defendant failed to provide

her with notice, under 29 CFR § 825.300, as to whether the leave requested would be counted as

FMLA leave.

The regulation specifies the notice runs from receipt of certification and shall be given "within

five business days absent extenuating circumstances." Defendant properly notes that the period for

notice did not expire until January 28, 2011–after Plaintiff had resigned. At that point the Defendant

did not owe Plaintiff any notice, since she was no longer an employee and she was not entitled to leave

because she was no longer an employee.

Even if Defendant had some responsibility to provide the notice, the failure to do so is not

actionable interference. "An employer's failure to provide an employee adequate notice of FMLA

rights may give rise to a claim of interference but only if such a failure causes Plaintiff to be denied

18

(5:11-CV-399)

benefits to which she was entitled." *Kitts v. General Telephone North, Inc.*, 2005 WL 3377438 at *9 (S.D. Ohio 2005), citing *Jeremy v. Northwest Ohio Dev. Ctr.*, 33 F. Supp 635, 639 2d (N.D. Ohio 1999.) To put it even more simply, "Employees seeking relief under the entitlement theory must...establish that the employer's violation caused them harm. " *Edgar*, *supra*, at 508, citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81,89.

Plaintiff has not identified any manner in which her failure to receive notice harmed her. Plaintiff did not lose her right to take FMLA leave because she didn't receive notice. Plaintiff lost her right to take FMLA leave because she was terminated, and would have been terminated whether or not she requested the leave. Since Plaintiff has not demonstrated any "'adverse consequence attendant upon [the] lack of knowledge,'" she has not established a *prima facie* case of FMLA violation under 29 U.S.C. § 2615 (a) (1.)[4]

**B**. Plaintiff Failed to Make a Prima Facie Showing of
    Retaliatory Termination Under §2615(a) (2)

To establish a *prima facie* case of FMLA retaliation, Plaintiff must show:

1) that she was engaged in an activity protected by the FMLA;
2) the employer knew she was exercising her rights under the FMLA;
3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and 4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Id.*, at 761, quoting *Killian v. Yorozu Auto. Tenn., Inc*, 454 F.3d 549, 556(6th Cir. 2006).

---

[4] Previously, as part of the *prima facie* case, in order for Plaintiff to establish by a preponderance of the evidence his entitlement to the benefit claimed, the Plaintiff had to persuade the trier of fact that any evidence set forth by the employer of a non-FMLA basis for action was insufficient and pretextual. *Arban,* 345 F.3d at 401. In light of the Sixth Circuit's ruling in *Donald*, *supra,* these issues will be considered during the burden shifting that occurs, under *McDonnell Douglas,* after Plaintiff's presentation of a *prima facie* case.

19

(5:11-CV-399)

The key date in retaliation claims is the date of the decision to terminate the employee, not the date the decision is communicated to the employee. *Thompson v. Gynecologic Oncology & Pelvic Surgery Associates*, 2006 WL 3491738 at ¶¶ 11,32 (Ohio App.10th Dist. Dec. 5, 2006) (state of mind to be evaluated is that at the time of termination decision, not time of communication to plaintiff); *cf. Arban v. West Publishing Corp.*, 345 F.3d 390 (6th Cir 2003) (jury verdict upheld when the jury could have reasonably believed the decision to terminate was not made until after the employee's leave). The uncontroverted evidence is that the termination decision was made on or before January 19, 2011.  The two persons responsible for the decision, Ms. Gotschall and Ms. Olivera, provided sworn declarations substantiating the decision was made before January 19; their statements are supported by a memorandum memorializing the decision, sent by Ms. Gotschall on January 19 at 7:16 p.m. (Gotschall Dec. ECF Doc. #17-3 at 154; Exhibit to Gotschall  Dec. ECF Doc. #17-3 at 163; Olivera Dec. ECF Doc. #17-4 at 167).

Since, under a retaliation theory, the employer's motive is an integral part of the analysis, Plaintiff must establish that those responsible for the termination decision had knowledge of her protected FMLA action.  As the Sixth Circuit explained in *Edgar v. Jac Products, Inc.*, "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Edgar v. Jac Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (emphasis in original). In this case, the Plaintiff contacted Elissa Snyder in Defendant's Human Resources Department on January 18 to request she fax FMLA forms. Plaintiff produced no evidence that  information regarding this request was communicated to either

20

(5:11-CV-399)

Ms. Olivera or Ms. Gotschall. Their statements under oath that they no knowledge of Plaintiff's request at the time they made the termination decision are uncontroverted.

Here, since the decisionmakers were unaware Plaintiff had engaged in any protected FMLA activity, retaliation for such activity could not have been their motive for the adverse employment action. Thus, Plaintiff has failed to establish elements 2, 3 and 4 of the required prima facie case of a violation of 29 U.S.C. § 2605 (a) (2.)

The only evidence and argument Plaintiff advances to avoid this conclusion is the temporal proximity of her request for leave, and her dismissal. There are several problems with this argument. First, the chronology does not support any inference FMLA protected activity was used as a basis for the adverse employment action: "'the wheels of termination' had already been put into motion before [Plaintiff] requested leave." *Gibson v. Vought Aircraft Industries, Inc.*, 387 Fed. Appx. 548, 552 (6th Cir. 2010), quoting *Kennebrew v. New York City Hous. Auth.*, No. 01-civ-1654, 2002 WL 265120 at *20 (S.D.N.Y. Feb. 26, 2002)(citation omitted). Second, the decision to terminate was made without knowledge any leave had been requested.

Plaintiff's request for FMLA leave did not alter Defendant's right to terminate Plaintiff: "[A]n employee who requests FMLA leave has no greater protection against termination of his employment for reasons unrelated to his FMLA request, then he did before submitting that request." *Allen v. City of Sturgis,*559 F. Supp.2d 837,850 (W.D. Mich. 2008), citing *Arban v. West Publishing Corp.*, 345 F. 3d 390 at 401(6th Cir. 2003) (citation omitted). Or, as the Sixth Circuit said more bluntly in *Gipson v. Vought Aircraft Industries, Inc*., "[A]n employee may not

21

(5:11-CV-399)

insulate [herself] from a pending dismissal by opportunistically invoking the FMLA." *Gipson*, 387 Fed. Appx. at 557.

Finally, it is well-established in the Sixth Circuit that temporal proximity, alone, is insufficient to establish discriminatory motive. *Jeremy v. Northwest Ohio Development Center*, 33 F. Supp. 2d 635, 639 ('Without more, coincidental timing is insufficient to create a genuine issue of material fact regarding [defendant's motivation." (citation omitted), *Donald*, 667 F3d at 763; *Arban*, 345 F. 3d at 403, *Allen*, 559 F. Supp, at 849, *Madoffe v. Safelite Solutions, LLC*, 2008 WL 755182 *8 (S.D. Ohio Mar. 21 2008).

C. <u>Defendant Has Established A Legitimate, non-FMLA Based
Reason for Discharge; Plaintiff Has Not Established Defendant's
Explanation is Pretext</u>

Since Plaintiff has not made out a *prima facie* case under either the interference or retaliation theories, the Court's analysis could end here. But, even if the Court found Plaintiff had established a *prima facie* case by a preponderance of the evidence, Plaintiff would still lose.

Under either the interference or the retaliation theory, no violation may be established if the employer has an independent basis for the employment action.  As set forth in *Donald*, under either interference or retaliation, after the prima facie case, the burden shifts to the defendant to present a "legitimate, nondiscriminatory" reason for termination; plaintiff claims can "survive summary judgment only if she can show that [defendant's] stated reasons are a pretext for discrimination." *Donald*, 667 F.3d at 761,762.

22

(5:11-CV-399)

In this case Defendant has put forth uncontroverted evidence that Plaintiff lied repeatedly to her superiors regarding her conduct, and that she was terminated for her dishonesty. It thus becomes Plaintiff's burden to demonstrate this reason for termination is pretext. To do so Plaintiff must show "the proffered reason '1)has no basis in fact; 2)did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action.'" *Gembus v. Metrohealth System*, 290 Fed. Appx. 842, 845 (6th Cir. 2008), quoting *Abbott Motor Co., Inc.*, 348 F. 3d 537, 542 (6th Cir. 2003) (citation omitted).

Plaintiff cannot demonstrate Defendant's explanation has no basis in fact–she admits she lied. The uncontroverted evidence in the case is that her lying was the motivation for her termination. Finally, her conduct was sufficient to justify the action: "Dishonesty, deception or fraud" were specifically listed in the Aultman Handbook as behavior warranting immediate termination. (ECF. Doc #20-2 at 409, 410.)

## VIII. Conclusion

For the foregoing reasons, Defendant's summary judgment motion is granted. Both sides to bear their own costs and attorney fees.


IT IS SO ORDERED.

10/31/2012                                   __*s/ David D. Dowd, Jr.*_____
Date                                          David D. Dowd, Jr.
                                              U.S. District Judge